| | | |
|---|---|---|
| MICHAEL LARSON, | : | Case No. 3:18-cv-00004 |
| | : | |
| Plaintiff/Counterclaim Defendant, | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| vs. | : | |
| | : | |
| CASSANO'S INC., | : | |
| | : | |
| Defendant/Counterclaim Plaintiff. | : | |
| | : | |

## DECISION AND ENTRY

## I.      Introduction

Plaintiff Michael Larson is a former longtime employee of Defendant Cassano's, Inc.  He asserts that Defendant violated his rights under the Family and Medical Leave Act, 29 USC § 2601, and discriminated against him because of his age in violation of Ohio Rev. Code § 4112.14.  He has voluntarily dismissed his claim that Defendant violated Ohio public policy. (Doc. #24, *PageID* #s 338, 343).

Defendant seeks summary judgment in its favor, but Larson contends that summary judgment is unwarranted because genuine issues of material fact and law remain on his FMLA and age-discrimination claims.

## II.      Background

Defendant is a family-owned business that has operated pizza restaurants for more than 60 years.  Larson began working for Defendant in 1991 as a Store Manager at one of Defendant's restaurants.  The parties refer to each of Defendant's restaurants as a store.

Over the years, Defendant employed Larson during two time periods. He first worked for Defendant from 1991 to 1995. He then worked with another pizza-related company for about 18 months. He returned to work for Defendant in 1997 and remained employed there until Defendant fired him on February 1, 2017. In total, Defendant employed Larson for 20-plus years.

Larson testified that during his first period of employment, he was promoted to area manager with responsibility for four stores. He was later promoted to district manager with additional responsibilities for more than four stores. His responsibilities included food and safety training; management and assessment of store records; management and assessment of finances and profitability for all assigned stores; food audits; compliance with safety policies and procedures; and personnel matters such as disciplining and discharging employees in his assigned stores.

When Larson began his second period of employment with Defendant (in 1997), he again worked as store manager. Within about one year, Defendant promoted him to district manager with responsibility for multiple stores. He held the position of district manager until 2016 when he was demoted to store manager and then terminated. But this gets ahead of the story.

In December 2012, Larson underwent knee-replacement surgery. His recovery took slightly less than two months. (Doc. #20, Larson's deposition, *PageID* #s 121-22). During this break, Larson used up his vacation pay and then received disability benefits. *Id*. at 122-23. In February 2013, he returned to work with Defendant in the same position—district manager. *Id*. at 122.

A document dated September 15, 2015, titled "Disciplinary Action Record," indicates that Larson was suspended without pay for two days due to a quality problem with five pizzas from one of his assigned stores. (Doc. #21, *PageID* #s 301-02). This document, signed by Janet Hurley—Defendant's Vice President of Operations—explains, "If this problem is not corrected and we are unable to receive quality pizzas from this store you will be terminated." *Id*. at 302. Larson acknowledged that his signature appears on this document. *Id*. at 226. He was a district manager at this time. He acknowledged during his deposition that he recalled getting a two-day suspension in September 2015. *Id*. at 231.

Another Disciplinary Action Record soon followed on October 1, 2015. This one concerns Hurley and Larson's visit to one of Larson's assigned stores where they found a problem with old pizza dough. Hurley provided a stern warning to Larson: "Any further instances of old dough at store … will result in a one week unpaid suspension to you…." *Id*. at 304. Larson recognized during his deposition that his signature appears on this document. *Id*. at 229.

Several weeks later, a "Disciplinary Action Record" reported that Larson's "cost results for September were unacceptable" and that his assigned stores had overspent $2,131.00 during September 2015. *Id*. at 303 (capitalization omitted). Another stern warning ensued: "Any future losses in this number of stores or in this magnitude will result in a one week unpaid suspension followed if necessary after recurring unacceptably large losses with termination." *Id*. (capitalization omitted). Larson agreed during his deposition that his signature is on this document. *Id*. at 226-27.

Larson recalled during his deposition that he acknowledged some poor job performance to Defendant in October 2015 and that he told Defendant he would rather be demoted to a store manager than be terminated. *Id*. at 231.

For six months in late 2015, Larson worked with knee and back pain. In January 2016, he underwent another knee surgery. He initially told Hurley that he would be on medical leave for three weeks. Yet his knee surgery did not sufficiently relieve his pain, leading him to back surgery. He testified during his deposition that he informed Hurley of the dates of his procedures. (Doc. #21, *PageID* #233). But he could not tell her the date on which he would return because his doctors did not give him a time frame. *Id*.

In February 2016, while Larson was on medical leave, Hurley emailed Defendant's Director of Operations, Brett Chapman, about Larson's possible return from leave. Hurley wrote:

> I think even if he comes back and for some reason we have to give him a district it should not be the one he had. He would get two new great employees and Ronnie will have done all the work. I know you're busy so just ignore my rant.

(Doc. #24, *PageID* #353). The next day Chapman responded to Hurley, discussing his preparation for an upcoming meeting with Larson. Chapman planned to tell Larson, "'Just three things, Mike: #1. Take care of healing and whatever needed to get back to 100%. #2. Communicate your progress often to Janet [Hurley]. #3. Deliver Doctor's notes to the office.'" *Id*. Chapman also mentioned the circumstances in the event Larson returned to work:

> I absolutely agree with your current thought about Mike's return at some point if it does occur. And if it does occur we

can access [sic: presumably, "assess"] it at that time and
strategize. If Mike returns I would consider it as supervising
one store or two max.

I heard and Ronnie brought up tonight how managers
commented that Mike was always so busy at particular stores.
"Mike was just busy with a lot on his plate." That's the
common thread. Everyone liked Mike but "the company"
kept him busy….

*Id.*

As it turned out, Larson was on medical leave for 5 months—he returned to work

on May 18, 2016. Rather than returning him to his former position as district manager,

Defendant assigned Larson to work as store manager in Fairborn, Ohio. (Doc. #20,

*PageID* #s 128-29). Defendant kept him at his same pay level—the pay of a district

manager. *Id*. at 124; *see* Doc. #21, *PageID* #s 245-46. He worked in the Fairborn Store

from May 2016 to January 2017. During this period, he enjoyed—"had a good time

again…"—working as Store Manager because this store was "set up for success …."

(Doc. #20, *PageID* #130).

In January 2017, Chapman informed Larson that he had to start working at another

store. Larson testified, "[Chapman] said that I had done a very good job at Fairborn, that

I had two weeks at North Main to get it ready to move to a new location." *Id*. at 131.

Larson understood that because the Fairborn Store improved its sales and was a success

during the time he managed it, Chapman wanted him to do the same things at North

Main. *Id*. at 137. Larson also understood that the reassignment to North Main would be

temporary. *Id*.

Larson did not enjoy working at the North Main Store. After he had worked at

North Main (apparently for about one week), he spoke with Chapman. Id. at 131. He testified that he never told Chapman that he would not work at the North Main Store. He clarified, however, "I did say that I didn't like it…. I just told him—I said politely…, 'I have been with the company that supported me for 25 years, so I am just giving you notice that I will be searching for other job opportunities.'" Id. at 131-32. Larson believes that in "the heat of the moment," he told Chapman he hated the North Main Store. Id. at 133.

Chapman offered Larson a reassignment or transfer to a store in Urbana, Ohio. This offer came "with a large, large pay cut," according to Larson. Id. at 132. Larson points out in his Memorandum in Opposition that "he turned down the transfer due to a reduction in pay …," and that "he did not refuse the North Main position as Defendant maintains." (Doc. #24, PageID #341).

Exhibit I to Larson's deposition contains information about Larson's termination. Brett Chapman apparently wrote it on February 1, 2017. (Doc. #20, PageID #173). Chapman describes what occurred during a meeting with Larson and Tim Steele (District Manager) at the North Main Store. Chapman indicates that he "let Larson review" a document that explained he was being reassigned to a store in Urbana at a reduced salary, "effective immediately."[1] Id. at 173 (referring to PageID #172). What occurred next, according to Chapman, resulted in Larson's termination:

> I asked Larson what he meant by he will not accept the transfer. Larson responded, "I will not accept this. I'm not going to do this." I asked Larson if he was refusing to follow

---

[1] The document Chapman references is also part of Exhibit I.

through with the transfer. Larson replied, "Yes, I'm refusing.
Am I fired?" I confirmed to Larson that he was fired for
refusing.

*Id*. at 173.

The following exchange during Larson's deposition sheds a little more light on the

transfer situation:

| | |
|---|---|
| Q [Defendant's counsel] | Okay. So you went to the North Main store and then you were offered to go to the Urbana location. You did not want to go there; is that correct? |
| A [Larson] | I was offered to go to the Urbana location with a huge pay cut … and I denied it. |

*Id*. at 245.

## III.    Motions For Summary Judgment

A party is entitled to summary judgment when there is no genuine dispute over

any material fact and when the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see*

*also Barker v. Goodrich,* 649 F.3d 428, 432 (6th Cir. 2011). To resolve whether a

genuine issue of material fact exists, the Court draws all reasonable inferences in the light

most favorable to the nonmoving party. *Richland Bookmart, Inc. v. Knox County,*

*Tenn.,* 555 F.3d 512, 520 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986)). With these reasonable inferences in

the forefront, "[t]he central issue is 'whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law.'" *Jones v. Potter,* 488 F.3d 397, 402-03 (6th Cir. 2007) (quoting, in part, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986)).

"Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Whitfield v. Tennessee,* 639 F.3d 253, 258 (6th Cir. 2011) (citations omitted). "If the [the nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986) (internal citations omitted); *see Owens v. National Indemnity Co.*, 2:17cv813, 2019 WL 1472096, at *2 (S.D. Ohio 2019) (Smith, D.J.).

## IV. Discussion

## A. <u>Age Discrimination</u>

### 1.
### <u>Ohio Law</u>

Ohio law prohibits employers from terminating "without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee." Ohio Rev. Code § 4112.14(A). Age discrimination claims brought under this Ohio statute are analyzed under the same standards as federal claims brought under the Age Discrimination in Employment Act. *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005); *see also Wharton v. Gorman-Rupp Co*., 309 F. App'x 990, 995 (6th Cir. 2009) (and cases cited therein).

Absent direct evidence of age discrimination, the inquiry into whether an employer violated § 4112.14(A) operates under the oft-repeated, burden-shifting framework described in *McDonnel Douglas v. Green*, 411 U.S. 792 (1973). *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (citation omitted). "Under *McDonnell Douglas* and its progeny, once the plaintiff succeeds in making out a prima facie case of age discrimination, the defendant must 'articulate some legitimate, nondiscriminatory reason' for the termination. 'If the defendant meets this burden, then the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext.'" *Id.* (quoting, in part, *McDonnel Douglas*, 411 U.S. at 802) (additional citation omitted).

### 2.
### Prima Facie Case

Defendant contends that Larson has not established a prima facie case of age discrimination. Larson disagrees.

"Age discrimination claims brought under the Ohio statute are 'analyzed under the same standards as federal claims brought under the [ADEA].'" *Blizzard*, 698 F.3d at 283 (citations omitted). "To establish a prima facie case of age discrimination, a plaintiff must show: '(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'" *Blizzard*, 698 F.3d at 283 (quoting, in part, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510 (2002)).

Defendant does not dispute that Larson was a member of a statutorily protected

(age forty or older) at the time of his termination or that his termination constituted an adverse employment action. (Doc. #20, *PageID* #102). Defendant instead contends that Larson's prima facie case fails because he cannot show he was qualified for the position of Store Manager. Defendant reasons that the job of store manager required the employee manager to travel, but Larson refused to do so when instructed to transfer to the North Main store and when offered a transfer to the Urbana store.

The qualifications element of a prima facie case targets "a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture, Inc*., 317 F.3d 564, 575 (6th Cir. 2003) (italics in original). Objective qualifications vary depending upon the job in question. *Id*. at 576. "[T]he inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *Id*.

Defendant does not argue that Larson lacked the educational requirements to be a store manager or that he lacked experience in the relevant industry. Larson had experience working for Defendant in the exact job in question—he was a store manager at the time of his termination. Defendant also originally hired him to be a store manager and promoted him over the years to positions with greater responsibilities, including district manager and area manager, and retained him for roughly 20 years. These undisputed facts show that he was objectively qualified to be Defendant's Urbana Store Manager.

Further, it would make no business sense for Defendant to hire him as a store manager and promote him to higher positions with supervisory authority over other store

10

managers if he lacked the objective qualifications to be a store manager. The fact that Defendant wanted to transfer, and did transfer, him to the North Main Store and offered to transfer him to the Urbana Store further shows his objective qualifications to perform the job of store manager. After all, it would be contrary to common sense and intelligent business practices for Defendant to offer him these transfers if he were not objectively qualified for these jobs.

Defendant's analytical mistake at the prima-facie stage is to rely on its asserted nondiscriminatory reason for terminating Larson's employment—"his refusal to work where coverage was needed…," (Doc. #20, *PageID* #96)—rather than on his objective qualifications to work as a store manager. "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Wexler*, 317 F.3d at 574.

Assuming, for the moment, that "travel where coverage was needed" was a job requirement for Defendant's store managers, the evidence construed in Larson's favor does not indicate that he was incapable of traveling to various stores. His dislike of travelling to the North Main Store and his refusal to transfer to the Urbana store were not based on his inability to travel; he simply did not want to travel to these store locations. This was so as to the Urbana location because the transfer was for much less pay rather than an inability to travel.

Defendant next maintains, "Plaintiff has failed to make a prima facie case of age

11

discrimination because he has not offered any evidence to support that he was replaced by someone outside the protected class ….."  (Doc. #25, *PageID* #375).  Defendant leans on Larson's testimony during his deposition that he did not know his replacement's (Brad Williams') age.  Larson guessed Williams was "[p]robably 45-ish."  (Doc. #21, *PageID* #s 251-52).

Defendant's argument arises under the fourth prong of a prima facie case—*i.e.,* "circumstances that support an inference of age discrimination."  *Blizzard*, 698 F.3d at 283.  "An allegation that the plaintiff was replaced by a younger individual supports an inference of discrimination only if the difference in age is significant."  *Id.*  Larson is not required to show that a person outside the protected class—someone under age 40—replaced him.  *Coryell v. Bank One Trust Co., N.A.,* 101 Ohio St.3d 175, 179-80 (2004).  Larson only needs to demonstrate that he was replaced by, or his termination permitted Defendant to retain, "a person of substantially younger age."  *Id.* at 180.

The fact that Larson did not know Williams' age is not conclusive about how old Williams was at the time of Larson's termination.  Larson may rely on evidence other than his own personal knowledge to establish Williams' age and, hence, the differences in their ages.  *Cf*. *Hale v. ABF Freight System, Inc*., 503 F. App'x 323, 334 (6th Cir. 2012) (ADEA: "[Hale] did not know the age of the [replacement] salesman but testified that one of the ladies was in her 40s and the other in her 50s… Viewing the record in the light most favorable to Hale, a reasonable jury could find that Hale was replaced by a woman substantially younger than he was…").

Defendant has produced a list of its employees in support of its statements that

Williams is over age 50 and close in age to Larson. (Doc. #25, *PageID* #s 376, 393). Defendant's list indicates that Williams was born in 1967. This means that on the date Defendant fired Larson, February 1, 2017, Williams was either age 50 (if he was born on or within a year before 2/1/67) or age 49 (if he was born within a year after 2/1/67).

Larson's counsel states that Defendant has conceded that Larson was 58 years old at the time of his termination. Assuming this is correct, the question is whether Williams—at age 49 or 50—was "substantially younger" than Larson—at age 58— when he was fired. *See Coryell*, 101 Ohio St.3d at 180.

The phrase "substantially younger" carries no definition by the Ohio Supreme Court. *See id.* at 181. "[I]n the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003) (surveying cases). "[W]hen replacement of the employee by a person who is six to ten years her [or his] junior must be considered on a case-by-case basis." *Blizzard*, 698 F.3d at 284. A zone of discretion therefore exists in the six-to-ten year range for determining whether a replacement was "substantially younger." *Id.*

Considering that Williams' age likely placed him 8 or 9 years further from retirement than Larson's age; that not long before his termination, Larson had undergone knee-replacement and back surgeries requiring him to take a lengthy period of leave with an uncertain return date; and that Larson's burden to show his replacement was substantially younger is "not onerous," the 8 or 9 year age difference between Larson and his replacement suffices to show his replacement was substantially younger. *See*

13

*Blizzard*, 698 F.3d at 284 (not an abuse of discretion to find the plaintiff's 6.5-year-younger replacement was substantially younger); *see also Erwin v. Village of Morrow, Ohio*, 2019 WL 1495921, at *9 (S.D. Ohio 2019) (Barrett, D.J.) ("more than six-year age difference" between the plaintiff his replacement satisfied his burden to establish fourth prong of his prima facie case); *cf. Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 101 S.Ct. 1089, 1094 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

**3.**
**<u>Legitimate Nondiscriminatory Reasons</u>**

Because genuine factual disputes exist over Larson's prima facie case, Defendant must articulate a legitimate nondiscriminatory reason for demoting Larson to store manager and later terminating his employment. *See Blizzard*, 698 F.3d at 283. Defendant's burden at this stage is one of production not persuasion. *See Provenzano v. LCI Holdings, Inc*., 663 F.3d 806, 814 (6th Cir. 2011) ("LCI is not required to persuade the court that it was actually motivated by the proffered reasons."); *see also Feltner v. Mike's Trucking*, 2:12cv96, 2014 WL 272446, at *7 (S.D. Ohio 2014).

Defendant articulates legitimate nondiscriminatory reasons for demoting Larson and terminating his employment. It asserts that Larson had a longstanding history of poor job performance and it backs this assertion up with evidence—Disciplinary Action Records and yearly performance evaluations. (Doc. #25, *PageID* #377 (citing Exhibit B, *PageID* #s 403-27)). As to Larson's termination, in addition to his poor job performance, Defendant states that it would not keep Larson at the North Main store when it knew he

was displeased with, and even hated, working there. It therefore offered Larson a transfer to the Urbana store, which he admits he refused, resulting in the nondiscriminatory decision to terminate his employment.

For these reasons, Defendant has identified legitimate nondiscriminatory reasons to demote and later terminate Larson's employment.

### 4.
### Pretext

With Defendant's nondiscriminatory reasons in place, Larson must produce evidence sufficient to create a genuine dispute over whether Defendant's asserted nondiscriminatory reasons were a pretext for age discrimination. *See Blizzard*, 698 F.3d at 285. This can be accomplished by producing sufficient evidence "'from which a jury could reasonably reject [the employer's] explanation of why it fired [him].'" *Id*. (quoting *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009)). Three possibilities point the way to pretext: The evidence shows "'(1) that the proffered reasons had no basis *in fact,* (2) that the proffered reasons did not *actually* motivate [his termination], or (3) that they were *insufficient* to motivate discharge.' " *Id*. (quoting *Chattman v. Toho Tenax Am., Inc.,* 686 F.3d 339, 349 (6th Cir. 2012) (emphasis in original)).

Larson does not directly identify or invoke any of the three methods to create a genuine issue of fact over pretext. His theory of pretext, however, points to the first and second method—that Defendant's proffered reasons had no basis in fact or did not actually motive Defendant. Larson theorizes that his age and health are intertwined in Defendant's eyes. He argues, "As you got older while working for Defendant and

suffered any health setbacks, they noticed and became unhappy when you were forced to take time away from work." (Doc. #24, *PageID* #345). He supports this with a citation to his deposition testimony where he explained, "I just noticed the more time I had missed I was being treated differently and assumed it to be age. I have seen other people that were aged that have been treated differently too, including one that was forced out." (Doc. #21, *PageID* #248).

Viewing Larson's testimony and the evidence in his favor, no reasonable jury could find pretext in Defendant's reasons for demoting Larson and terminating his employment. The evidence upon which Defendant relies, *see supra*, § IV(A)(2), demonstrates that despite repeated counseling and coaching, Larson's job performance did not improve. Larson's signature on many of these job-performance reviews along with his contemporaneous summaries of his work strengths and weaknesses show his acknowledgement that there was a factual basis for the non-satisfactory performance reviews he received. *E.g.,* Doc. #21, *PageID* #s 310-18. And there is no hint in these records that Defendant was considering stereotypical age-related factors—such as too much fatigue, inability to adapt to changes, slow in learning new things, and the like—when assessing his job performance. *See id.*; *see also PageID* #s 298-308.

Larson argues that he "received written Disciplinary Action Records that *could appear to be suspect* and placed in Larson's file to purposely begin to make his personnel file[] heavier." (Doc. #24, *PageID* #346 (emphasis added)). He further argues that one of his Disciplinary Action Records was improperly given to him. Yet he does not offer any affirmative evidence that his performance reviews or the Disciplinary Action

Records were not based in fact, were incorrect, or were inappropriately conducted. Larson also acknowledged during his deposition that in October 2015, he had some poor job-performance problems. He further testified that he remembers telling Defendant about his preference for a demotion to a store manager position rather than termination for poor performance as a district manager. (Doc. #21, *PageID* #231). And there is nothing more than speculation in the record to indicate that Defendant attempted to pad his employment file with negative-performance reviews for the purpose of demoting Larson because of his age. His assumption or belief in Defendant's discriminatory motive is insufficient by itself to create a genuine issue of material fact about pretext. *See Johnson v. Fifth Third Bank*, 685 F. App'x 379, 386-89 (6th Cir. 2017) ("Other than her own personal beliefs, Johnson has provided no evidence of pretext that could create a genuine issue of fact as to Fifth Third's legitimate grounds for her termination.").

Defendant has offered ample evidence that it demoted Larson to store manager based on his poor performance as a district manager. While Larson was not a successful district manager, he had a unique and valuable skillset as a store manager. There is no genuine dispute over the fact that he was a skilled "fixer" for Defendant. In this role, he moved to various stores and transitioned those stores for a remodel or relocation. He also trained staff and improved store operations during these remodels or relocations. The fact that Defendant valued these skills and Larson's work as a store manager is confirmed by its decision to demote him to store manager rather than terminate his employment due to his poor-job performance as district manager.

Larson, moreover, was unhappy about his transfer to Defendant's North Main

store.  Although he did not refuse the transfer, he expressed to Chapman his dislike, even his hatred, of working at North Main.  And he told Chapman that he would be looking for other jobs.  (Doc. #21, *PageID* #238).  Yet, rather than firing Larson after he told Defendant he was looking for work elsewhere, Defendant offered Larson the position of store manager at its Urbana store.  Larson sees pretext here because the offer included a huge pay cut.  Larson, however, has not estimated the amount of pay cut he would have suffered if he had accepted the position of store manager in Urbana.  And Defendant offers a nondiscriminatory reason for the pay cut—its Urbana location could not support the salary Larson had received as a district manager.  The record does not contain affirmative evidence refuting this.  The fact, moreover, that Defendant had previously continued to pay Larson a district manager's salary when he was demoted to store manager in Fairborn tends to show that Defendant valued Larson's work skills—instead of showing that it had implemented a plan to first demote him then fire him because of his age.

Tacking in a different direction, Larson argues that Defendant's age bias appeared before his termination when it discriminated against two other employees—Otha Lowe and Dennis Murphy—by treating them differently, including terminating them, because of their age.  But Larson provides no affirmative evidence to support these allegations.  His blanket statements are grounded on hearsay:  He was told that these two other employees were terminated or forced to retire because of their ages.  (Doc. #21, *PageID* #s 249-50).  Such statements are insufficient to create a genuine dispute over the existence of pretext in Defendant's nondiscriminatory reasons.  "'[E]vidence submitted in

opposition to a motion for summary judgment must be admissible. Hearsay evidence ...

must be disregarded.'" *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007)

(quoting *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1189 (6th Cir.

1997)).

Accordingly, Larson has not created a genuine dispute over the existence of

pretext in Defendant's nondiscriminatory reasons for demoting him and terminating his

employment. Summary judgment is therefore warranted in Defendant's favor on

Larson's age-discrimination claim.

## B.     Family and Medical Leave Act

Larson asserts that Defendant violated his rights under the FMLA by conspiring to

limit his duties as District Manager and by demoting him from district manager to store

manager in May 2016 because he had taken medical leave in early 2016.

Under the FMLA, "an eligible employee shall be entitled to a total of 12

workweeks of leave during any 12-month period ... [b]ecause of a serious health

condition that makes the employee unable to perform the functions of the position of such

employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA prohibits an employer "from

interfering with, restraining, or denying the exercise of (or attempts to exercise) any

rights provided by the Act…," 26 C.F.R. § 825.220(a)(1), and from discharging an

employee or "in any other manner discriminate" against an employee for exercising

FMLA rights. 29 U.S.C. § 2615(a); *see Demyanovich v. Cadon Plating & Coatings,*

*L.L.C.,* 747 F.3d 419, 427 (6th Cir. 2014). The parties appear to agree that the

*McDonnell Douglas* framework, discussed above, applies to Larson's FMLA claim.  *See Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012).

Defendant does not presently contend that Larson's knee and back problems, which required surgical treatment, fail to qualify as "serious health" conditions under the FMLA or that he failed to comply with the FMLA-leave requirements.[2]  Defendant argues that Larson cannot prevail on his FMLA claim because he could not return to work when his 12 weeks of FMLA expired.

There is no genuine dispute over the fact that Larson's leave extended beyond the FMLA-mandated 12 weeks.  When his FMLA expired on March 28, 2016, he remained on leave for 6 more weeks.  (His total leave lasted nearly 18 weeks—January 4, 2016 to May 18, 2016).

FMLA regulations specifically address an employee's rights upon returning to work from a period of authorized FMLA leave:

> (a) On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.

29 C.F.R. § 825.214(a).  "However, the regulations also clearly state that an employee who cannot return to work at the end of the approved leave is not entitled to job restoration[.]"  *Hicks v. Leroy's Jewelers, Inc*., No. 98-6596, 2000 WL 1033029, at *4–5 (6th Cir. 2000).  The applicable regulation states:

> (b) If the employee is unable to perform an essential function

---

[2] It is not clear that Larson was on unpaid FMLA leave.  *See* Doc. #223, *PageID* #s 223 (Larson acknowledges that he received disability and vacation benefits during his leave of absence).  At this point in the litigation, the Court assumes that he was on FMLA leave starting in January 2016.

> of the position because of a physical or mental condition,
> including the continuation of a serious health condition, the
> employee has no right to restoration to another position under
> the FMLA.

*Id.* § 825.214(b). "[A]n employee on approved FMLA leave has no right to job restoration under the Act, if she [or he] fails to return to work twelve weeks after [his] or her leave began." *Hicks*, 2000 WL 1033029, at *5; *see Demyanovich*, 747 F.3d at 429 ("Thus, when an employee is indisputably unable to work at the end of the statutory leave period, he has not been denied any benefit to which he was entitled even if his employer denied his request for leave.").

Because Larson's FMLA leave expired six-weeks before he was able to return to work, the FMLA did not afford him the right to return to the job of district manager. *See Demyanovich*, 747 F.3d at 429; *see also Hicks*, 2000 WL 1033029, at *4-5; *see also Austin v. Fuel Sys., LLC*, 379 F.Supp.2d 884, 889 (W.D. Mich. 2004) (and cases cited therein) ("an employee who exceeds the permitted FMLA leave time has no right to be restored to his or her job.").

In addition, for the same reasons discussed above, *supra*, §IV(a), Larson has not shown that Defendant's reasons for his demotion and termination were not its actual reasons for those actions. Larson has also not produced evidence sufficient to create a reasonable inference that Defendant's nondiscriminatory reasons were a pretext for retaliation because he took FMLA or a medical leave of absence. *See Mullendore v. City of Belding*, 872 F.3d 322, 327 (6th Cir. 2017) ("[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to

the exercise of FMLA rights for engaging in the challenged conduct.").

Larson relies on Hurley and Chapman's email exchange in February 2016 as evidence of a conspiracy and a causal connection between his leave of absence and his termination. Yet, the substance of their emails contains no evidence of a conspiracy or retaliation against Larson because he took FMLA leave. There is no reference to Larson's age, and there is no age-discriminatory comment in the emails. Hurley's email instead showed she was beginning to plan for Larson's return to work, if it came to be. She wrote:

> I think even if he comes back and for some reason we have to give him a district it should not be the one he had. He would get two new great employees and Ronnie will have done all the work. I know you're busy so just ignore my rant.

(Doc. #24, *PageID* #353). Although it appears that she did not want to assign Larson to his former district, she remained willing to give him a district. Her explanation for this was not age related; she simply did not Larson to benefit from the work that someone else (Ronnie) had done.

As to Hurley's self-described "rant" in her February 2016 email, at best for Larson, this merely tends to show Hurley was frustrated with the possibility that Larson might unfairly benefit from work performed by another manager. It provides no basis for a reasonable inference that she had a discriminatory or retaliatory motive due to Larson's need for FMLA leave. Similarly, Chapman's return email provides no insight the existence of a conspiracy to retaliate against Larson because he took FMLA leave. Chapman instead planned to tell Larson three things: "#1. Take care of healing and

whatever needed to get back to 100%. #2. Communicate your progress often to Janet.

#3. Deliver Doctor's notes to the office." (Doc. #24, *PageID* #353). Chapman

mentioned Larson's pay and disability only when informing Hurley, "If asked about pay

or anything disability, I'll suggest he contact Gale or Sayer for direct info. relay." *Id.*

This fails to create a reasonable inference that Chapman or Hurley held a retaliatory

motive against Larson because he took FMLA leave. It merely anticipates the questions

Larson would understandably raise upon his return from medical leave. There is simply

nothing in these emails to create a genuine issue of material fact over the existence of a

conspiracy against Larson because he took FMLA leave or that Defendant held a

discriminatory or retaliatory motive to demote or fire him.

For these reasons, summary judgment in Defendant's favor is warranted on

Larson's FMLA claim.

## C.     Remaining State-Law Counterclaims

Defendant has three remaining state-law counterclaims against Plaintiff: (1)

tortious interference with business and prospective business relationships; (2)

defamation; and (3) false light. (Doc. #15, *PageID* #s 77-79). The Court lacks diversity

jurisdiction over these state-law counterclaims due to lack of complete diversity of

citizenship between the parties. *See* 28 U.S.C. § 1332(a). Apparently recognizing this,

Defendant asserts that the Court has supplement jurisdiction over its counterclaims under

28 U.S.C. § 1367. *Id.* at ¶5. Although this was correct during the time Plaintiff's federal

claim was pending, *see* 28 U.S.C. §1367(a), there is presently no remaining federal claim

over which this Court has original jurisdiction. *See* 28 U.S.C. § 1331. In this situation,

exercise of the Court's supplemental jurisdiction over Defendant's remaining state-law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *see also Winkler v. Madison County*, 893 F.3d 877, 905 (6th Cir. 2018) ("'[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.'") (quoting *Rouster v. County of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014) (other citation omitted)).

**IS THEREFORE ORDERED THAT**:

1. Defendant Cassano's Inc.'s Motion for Summary Judgment (Doc. #20) is granted and Plaintiff's claims are dismissed;

2. The Clerk of Court is instructed to enter Judgment against Plaintiff and in favor of Defendant on Plaintiff's remaining claims;

3. Defendant's counterclaims are dismissed without prejudice under 28 U.S.C. § 1367(c)(3); and

4. The case is terminated on the docket of this Court.

June 19, 2019                              *S/Sharon L. Ovington*
                                           Sharon L. Ovington
                                           United States Magistrate Judge